**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0344-24

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

ZACHARY A. LAHNEMAN,

     Defendant-Respondent.

_____

> Argued March 5, 2025 – Decided June 27, 2025
>
> Before Judges Marczyk and Torregrossa-O'Connor.
>
> On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 23-02-0082.
>
> Narline Casimir, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for appellant (Elizabeth Parvin, Acting Gloucester County Prosecutor, attorney; Narline Casimir, on the briefs).
>
> Samuel Carrigan, Assistant Deputy Public Defender, argued the cause for respondent (Jennifer Nicole Sellitti, Public Defender, attorney; Samuel Carrigan, on the brief).

PER CURIAM

We granted the State leave to appeal the portion of the trial court's June 26, 2024 order and oral decision granting in part defendant Zachary A. Lahneman's motion to suppress post-Miranda[1] statements he made after previously invoking his rights to counsel and to remain silent, as well as the court's August 26, 2024 order granting the State's motion for reconsideration, but again denying suppression of the statements.  Because we conclude the trial court did not abuse its discretion in finding the suppressed statements resulted unconstitutionally from the functional equivalent of interrogation, we affirm.

## I.

An indictment was returned charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1), and related firearms offenses, as a result of a fatal shooting on November 16, 2022.  Defendant moved to suppress numerous self-incriminating statements he made to law enforcement at various stages of his encounter with police on the day of the homicide.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0344-24

A.

We derive the following largely uncontested facts from the suppression hearing record. The pertinent evidence came principally from the testimony of Gloucester County Prosecutor's Office (GCPO) Lieutenant John Petroski, then-supervisor of GCPO's Major Crimes Unit and video recordings of defendant's statements and the circumstances surrounding them.

On the day Victor Marrero's dead body was found with a gunshot wound to the head, responding police and GCPO investigators arrested defendant at the scene. Defendant, then in his twenties, was transported to the GCPO, and Lieutenant Petroski testified he escorted defendant to the booking room to be fingerprinted and photographed. Recordings from that room depict defendant making a series of statements, using expletives, denying involvement in the shooting, asking for his cell phone to call his mother and girlfriend, and generally disparaging investigators and the State of New Jersey. Those statements are not the subject of this appeal.

Defendant was then taken to an interview room to be questioned formally by Detective Krystal Santiago. The parties do not dispute that the interview was recorded, and that Detective Santiago recounted advising defendant of his Miranda rights. When the detective asked defendant if he waived those rights,

A-0344-24

he told her he did not, while simultaneously signing a waiver form. Defendant apparently answered questions, before expressly requesting an attorney and to speak with his mother, ending the questioning. The trial court suppressed the statements made during that formal interview. That order was not appealed. The parties reference it only for context in considering the statements that followed.

After the interview, defendant was transported to the hospital "for clearance for incarceration" because he claimed he had an injury to the inside of his mouth "from being punched." Lieutenant Petroski testified that when defendant was returned to the GCPO he again requested to speak to his parents. The lieutenant explained defendant's phone had been taken as evidence, stating that "[n]ormally[,] we would turn it over [to him,] . . . [t]urn off the audio equipment and walk out so . . . they can have a phone call." Instead, Lieutenant Petroski allowed defendant to use his phone but the officer stayed in the room with defendant while he called, explaining:

> So I went in the room with his phone, got whatever contact that he had wanted from the phone, opened it up and then made a phone call. But prior to [that, I] explained to him you are being recorded. I am staying in this room. I'm not going to be turning off the audio equipment. I'll be, in essence, manipulating your phone the whole time. You cannot touch your phone[,] to which [defendant] agreed.

4

The exchange was recorded by video cameras in the room and depicts the lieutenant explaining he would provide the phone to defendant but then discussing the charges in the case. The lieutenant told defendant, "[Y]ou can't take your cell phone with you and I can't have you going through it. So I can open it for you, go to the number you want to call and have it on speaker, but I can't have you manipulating it." Defendant responded that "all the evidence" "for [his] court case" was on the phone, and the lieutenant assured him it would be "preserv[ed]."

Defendant again said he needed to call his girlfriend and his mother, to which Lieutenant Petroski told him, "[Y]ou're going to . . . the [c]ounty [j]ail," and when defendant asked, "Why [am I] not going home?" the following conversation followed:

> [LIEUTENANT PETROSKI]: Because you're being criminally charged.
>
> [DEFENDANT]: For what?
>
> [LIEUTENANT PETROSKI]: You're being criminally charged with homicide, possession of a weapon, and unlawful possession of a weapon.
>
> [DEFENDANT]: How's it unlawful possession of a weapon?

[LIEUTENANT PETROSKI]: Because . . . you don't have a permit to carry and you used it unlawfully against somebody.

[DEFENDANT]: I don't even remember having it on me.

[LIEUTENANT PETROSKI]: Okay, well you did.

[DEFENDANT]: That sucks.

[LIEUTENANT PETROSKI]: Yeah. And it sucks for the guy who's dead too.

[DEFENDANT]: He's dead?

[LIEUTENANT PETROSKI]: Yeah, that's why you're being charged with a homicide.

[DEFENDANT]: F[***]. How many years is that?

[LIEUTENANT PETROSKI]: You got to get through court first.

[DEFENDANT]: I was just trying to get the f[***]ing inheritance–so I could get the f[***] out of this [s]tate. Now all my f[***]ing–

[LIEUTENANT PETROSKI]: At this point . . . you're going to be detained.

[DEFENDANT]: But I was already detained, so I'm going to be arrested.

[LIEUTENANT PETROSKI]: What's that?

[DEFENDANT]: So I was already detained.

6

[LIEUTENANT PETROSKI]: Well this time you probably will be held. I mean you'll go through court hearings; you know that. And then you'll have your day in court. . . . [T]hey'll do a [hearing] . . . on whether or not they'll detain you for these charges. You'll have a court hearing for that. That will happen not as fast because of the seriousness of this crime. You'll have a first appearance tomorrow, but everything will be delayed most likely seven days.

In response, defendant again said, "I[ am] going to . . . need a lawyer."

Lieutenant Petroski then asked, "[D]o you want me to get the phone so you can call your mother and call your . . . girlfriend?" and defendant said, "Yeah." Defendant then proceeded to incriminate himself when speaking to his mother on speaker phone in the recorded room in Lieutenant Petroski's presence. The lieutenant did not make his presence known to defendant's mother. Specifically, the following occurred and was captured on the recording played at the hearing:

[DEFENDANT'S MOTHER]: Not good right now. What the f[***] happened?

[LIEUTENANT PETROSKI]: Just tell her that we're in here don't–you know what I mean? Just tell her . . . where you're going.

[DEFENDANT]: I'm going to County and–I had an issue with a guy with a dog and apparently he w[ou]nd up dead.

7

[DEFENDANT'S MOTHER]: Well you shot him dead. Why []did you have your gun to–? What . . . is going on, Zachary?

[DEFENDANT]: I'm trying–

[DEFENDANT'S MOTHER]: You killed him?

[DEFENDANT]: Accidentally; I didn't think I–we got in a fight and then f[***]ing he punched me in the face and I blacked out. Apparently I had my gun on . . . me and I forgot I had it on me and I shot him. He . . . .

[DEFENDANT'S MOTHER]: Oh my God, Zachary–

[DEFENDANT]: []was going for it. He was going to do it to me. He was going for it, so I had to do it.

[DEFENDANT'S MOTHER]: Yeah, but w[ere] there any witnesses?

[DEFENDANT]: Not that I know of. Again–

[DEFENDANT'S MOTHER]: Oh my God, Zachary. What the f[***]?

[DEFENDANT]: Can you contact–for me please? I know it's a f[***] up.

[DEFENDANT'S MOTHER]: So am I coming down? Can I visit you in jail?

It was at this time that Lieutenant Petroski interjected stating:

[LIEUTENANT PETROSKI]: Ma'am, so it's Sergeant Petroski with the [GCPO]. He'll be sent to the Salem County Jail. He will . . . be able to make some phone calls to you once he gets in and he gets settled, whether

8

it be by video or by phone. I'm going to make sure that he has your number written down, because he won't have his phone with him, so he'll be able to contact you. He will have a court case, a first appearance tomorrow, but it will be delayed. Most likely in the next seven to ten days he'll have a first appearance where they will decide whether or not they are detaining him or releasing him . . . to the court date.

He further explained the detention process to defendant's mother, but never provided renewed Miranda warnings or cautioned defendant, who then continued to speak to his mother:

[DEFENDANT]: –(indiscernible) and he went for it, so I thought I was going to die, so–

[DEFENDANT'S MOTHER]: But, Zachary, Zachary,–

[DEFENDANT]: –I had to . . . I know, I f[***]ed up.

[LIEUTENANT PETROSKI]: Don't–don't–

[DEFENDANT'S MOTHER]: You f[***]ed up. You f[***]ed up . . . and you killed someone, dude. Dude, you know–

[DEFENDANT]: I wasn't trying to shoot him. I was (indiscernible) and f[***]ing finger–my finger was–

[DEFENDANT'S MOTHER]: Oh my God.

Lieutenant Petroski, again without warnings or admonishments, asked defendant's mother for her phone number so that he could "write it down for [defendant]" and continued explaining the detention process. He did not advise

that defendant requested a lawyer, but indicated that defendant would be assigned a public defender if he did not retain his own attorney.

From there, defendant again engaged his mother in conversation about the shooting:

> [DEFENDANT]: Mom, (indiscernible) and tell him . . . what's going on with the inheritance and everything. That's–
>
> [DEFENDANT'S MOTHER]: Yeah–yeah, Zachary, oh my God, . . . you can get life in prison, dude. What am I going to do?
>
> [DEFENDANT]: I can get life in prison for this?
>
> [DEFENDANT'S MOTHER]: You murdered–
>
> [LIEUTENANT PETROSKI]: (Indiscernible) . . . it's a serious crime. It's a serious crime.
>
> [DEFENDANT'S MOTHER]: Murder is a serious crime, Zachary. Don't you ever listen to me?
>
> [DEFENDANT]: I did and I forgot I had the gun and he went for it, so I thought he was going to shoot me and then he f[***]ing–he got shot instead.
>
> [DEFENDANT'S MOTHER]: Oh–you could have called the f[***]ing police and–
>
> [DEFENDANT]: No, he attacked me. He attacked me.

At that point, Lieutenant Petroski cautioned that he was listening, and ended the conversation:

A-0344-24

> [LIEUTENANT PETROSKI]: Listen, we're all sitting . . . in a room. I don't–
>
> [DEFENDANT'S MOTHER]: Well–there's . . . no witnesses, Zachary.
>
> [LIEUTENANT PETROSKI]: Ma'am, . . . I don't want you—please stop talking about the incident itself . . . You know, just[] that you two were talking about any directions or him calling you or—so tomorrow at some point he'll be able to make that phone call to you. He will have access to a phone and video . . . court too—or video phone calls at some point. So you'll be able to see him—

Following that phone call, defendant asked to call his father, to which the lieutenant agreed, cautioning, "All right, don't talk about the case. . . . [Y]ou already asked for an attorney; all right?"

Defendant then proceeded to discuss guns in front of the lieutenant, recorded and on speaker phone:

> [DEFENDANT]: . . . [A]re all the guns locked up?
>
> [DEFENDANT'S FATHER]: (Indiscernible)–Sheriff's Department.
>
> [LIEUTENANT PETROSKI]: Sir, let me—this is [Lieutenant] Petroski. I'm also in the room with your son. The phone is on speaker phone. We are in an interview room, so I need you to know that before some of the things that you say to him; all right?
>
> [DEFENDANT'S FATHER]: All right.

11

A-0344-24

[DEFENDANT]:  I just want to make sure that guns are locked up and—paperwork in the . . . cases.

[DEFENDANT'S FATHER]:  Well, yeah, they were . . . all locked up; yeah.

[DEFENDANT]:  All right, what . . . other one?  The—

[DEFENDANT'S FATHER]:  I have no idea–; I can't go in the apartment.

[DEFENDANT]:  Why can't you go in–

[LIEUTENANT PETROSKI]:  It's currently locked down because we're doing a search warrant on it.

[DEFENDANT'S FATHER]:  Yeah, I haven't been . . . in the apartment all day.

[DEFENDANT]:  So—the apartment?

[LIEUTENANT PETROSKI]:  Nobody's been in the apartment since the incident.  They're writing a search warrant.  We're getting a court judge to . . . give us permission to go in your house.

[DEFENDANT'S FATHER]:  We're locked out—we're locked out all day.

[DEFENDANT]:  Oh I'm sorry, Dad.

[LIEUTENANT PETROSKI]:  That should be . . . getting done soon, sir, in the next hour or so, so . . . it won't be that much longer for you.

[DEFENDANT'S FATHER]:  All right.

12

[DEFENDANT]: Well I know your gun is locked up and I know the other ones are locked up. The only one that's not is the one that I supposedly–. And I forgot I had it on me.

[DEFENDANT'S FATHER]: All right.

[LIEUTENANT PETROSKI]: Again, dude,–

On cross-examination, Lieutenant Petroski admitted that defendant's phone call with his mother would "normally [be] a private phone call" and "wouldn't be tap[ed]." However, he explained that "the phone was evidence" and was preserved to prevent him from "destroying" any subsequent evidence "that would be part of the court case." He also admitted that there were alternative methods for defendant to contact his mother without speaking with her on speaker phone while being recorded; specifically, he "could use [his] personal phone . . . or [his] assigned work phone" but in the past he experienced people "calling [him] on that number trying to get the status of . . . their loved one[s]." He also admitted that he could have utilized "[a] bank number from [the] department" but "no one answers because it doesn't come back [GCPO]."

B.

After the conclusion of the hearing, the parties returned for oral argument, but both relied on their briefs. The trial court issued an oral decision that same

A-0344-24

day.[2]  In relevant part, the court granted defendant's motion to suppress "the audio and video recordings of . . . defendant's phone calls with his parents as initiated by the [GCPO]."[3]

The court found Lieutenant Petroski's testimony credible and relied on the video recordings of the relevant encounters and conversations.  The court observed that before making the calls, defendant was advised that "he[ was] being charged with homicide, unlawful possession of a weapon, and possession of a weapon for [an] unlawful purpose," observing that "there [wa]s no real administration of any Miranda warnings at all."  It found that after defendant had invoked his right to counsel when he was interviewed by Detective Santiago, and later requested to speak with his mother and with an attorney, "[t]he request by . . . defendant to speak with an attorney and to speak with his mother [we]re inextricably intertwined."

---

[2]  The court indicated its intent to issue a written opinion, but the record does not contain a written opinion.

[3]  In the same decision, the court granted defendant's motion to suppress defendant's "recorded statement . . . [made] under custodial interrogation that was conducted by Detective Santiago."  The court denied defendant's motion to suppress "statements made by . . . defendant at the location of the Washington Township public golf course parking lot" immediately after the incident occurred.

Regarding defendant's call with his mother, the court stated, "It [wa]s only after . . . defendant . . . made a number of significant incriminating statements that Lieutenant Petroski identifie[d] that he also [wa]s on the phone call and that everything [wa]s being recorded."  Although the court recognized that Lieutenant "Petroski quickly jump[ed] in and the phone call end[ed] much more quickly than the phone call with [defendant's] mother," the court found that "[a]t no point during [Lieutenant] Petroski's interaction with . . . defendant in calling his parents did [Lieutenant Petroski] advise [defendant] of his <u>Miranda</u> rights."

The court cited to the analogous facts in <u>State in the Interest of A.A.</u>, 240 N.J. 341 (2020), stating:

> Now the police allowed the juvenile in the <u>A.A.</u> case to speak with his mother through a gate in the holding cell.  While they talked, the arresting officers were in the room within [ten] to [fifteen] feet of the juvenile.  The detective had explained to the juvenile's mother that it was a . . . "safety precaution consistent with police protocol," . . . for them to be present.  The police did not attempt to question the juvenile, nor did they provide <u>Miranda</u> warnings.
>
> In a . . . pretrial hearing, pursuant to Rule 104(c), the State sought to admit at trial the juvenile's statements.  The statements were admitted for the purposes of the juvenile's trial there.

15

A-0344-24

The court noted that in A.A., the Supreme Court found "[t]he police should have known that it was reasonably likely that [the juvenile's] mother would elicit incriminating responses from him."  240 N.J. at 358-59.

The trial court acknowledged that "there are heightened protections concerning juvenile custodial interrogations, [but] the functional equivalent standard expressed [in Rhode Island v. Innis, 446 U.S. 291 (1980),] . . . as adopted by New Jersey courts is equally applicable here."

The court accepted as true Lieutenant Petroski's testimony that he did not allow defendant to manipulate the phone to prevent defendant from deleting incriminating evidence, but nevertheless concluded that "the phone calls were . . . utilized by the detective to elicit further incriminating statements from . . . defendant."  The court noted as "telling" that the lieutenant told defendant the landlines were recorded, "all the time knowing that audio and video recording was going on, the entire interaction with regard to Lieutenant Petroski making phone calls to . . . defendant's parents was being captured."  It further referenced as significant that Lieutenant Petroski did not identify himself to defendant's mother until after defendant made numerous incriminating statements, "wait[ing] until those statements all get out and then he suddenly jump[ed] in" to advise that he was listening and let her know that defendant had

been charged. The court found this further demonstrated Lieutenant Petroski's "actual state of mind, knowing that the making of those phone calls would have likely resulted in incriminating statements . . . being made by . . . defendant."

The court determined statements made as a result of Lieutenant Petroski's post-invocation interaction with defendant "was the functional equivalent of custodial interrogation by making the phone calls to his parents . . . and [Lieutenant] Petroski . . . knew or definitely should have known that those phone calls would have . . . elicited incriminating statements." Accordingly, it suppressed those statements.

The State moved for reconsideration, arguing the court incorrectly characterized Lieutenant Petroski as not announcing his presence or cautioning defendant or his mother because Lieutenant Petroski reminded defendant of his presence throughout defendant's time at the GCPO. The State further contended the lieutenant never testified that he did not have defendant make calls on the landlines because those lines are recorded. Arguing that the court also misapplied the law, the State challenged the court's reliance on A.A., which the State asserted addressed legal considerations applicable only to juveniles with "different protections."

A-0344-24

The trial court "granted the reconsideration application insofar as the [c]ourt believe[d] there . . . [were] sufficient facts presented" to reconsider, specifically that there was no testimony that the "bank[] phone numbers were recorded lines." The court then denied the State's application as to "the ultimate determination." With respect to the recorded phone calls to defendant's parents, the court again noted Lieutenant Petroski "d[id] not re-[M]irandize . . . defendant." The court found the lieutenant did not "make any effort to do that at all. And it . . . would be guess and speculation as to what . . . defendant would have done if he had been [M]irandized before the phone calls took place." Ultimately, the court concluded that "the utilization of that phone call was the functional equivalent of custodial interrogation."

This appeal followed.

## II.

The State argues the following:

> POINT I
>
> LEAVE TO APPEAL SHOULD BE GRANTED TO PREVENT IRREPA[R]ABLE HARM TO THE STATE.
>
> POINT II
>
> THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING DEFENDANT'S MOTION TO

18

SUPPRESS THE PHONE CALLS MADE TO HIS PARENTS.

The State contends the court abused its discretion in suppressing the post-invocation statements arguing: (1) the court failed to distinguish between the legal significance of a defendant seeking to speak with counsel and defendant's request to call his parents; (2) the court misapplied A.A. which concerned juveniles in custody; (3) the record contained no evidence that defendant was compelled by police to make those statements to his parents; and (4) the recordings reflect it was defendant's mother and not police who posed questions to defendant.

III.

When reviewing a motion to suppress statements, we "defer to the factual findings of the trial court if those findings are supported by sufficient credible evidence in the record." State v. Sims, 250 N.J. 189, 210 (2022). Deference to a trial court's factual findings is appropriate because the trial court has the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). The trial court's legal conclusions, however, are reviewed de novo. See State v. Hubbard, 222 N.J. 249, 263 (2015).

Fundamental constitutional principles govern this determination. "The United States Supreme Court clarified the Fifth Amendment right against self-incrimination in <u>Miranda</u> by establishing safeguards 'to protect a suspect's right against self-incrimination from the psychological pressures inherent in a police-dominated atmosphere that might compel a person to speak where he would not otherwise do so freely.'" <u>State v. Tiwana</u>, 256 N.J. 33, 41 (2023) (quoting <u>State v. L.H.</u>, 239 N.J. 22, 41-42 (2019)) (internal quotation marks omitted). New Jersey similarly safeguards an accused from coercive police conduct and its "common law privilege against self-incrimination affords greater protection to an individual than that accorded under the federal privilege." <u>State v. Vincenty</u>, 237 N.J. 122, 132 (2019).

The Sixth Amendment of the United States Constitution and Article 1, Paragraph 10 of the New Jersey Constitution guarantee a defendant's right to the assistance of counsel. <u>See</u> <u>State v. A.O.</u>, 198 N.J. 69, 81 (2009). "Although the Sixth Amendment, like the Fifth Amendment, guarantees the right to counsel in pretrial interrogation, the two guarantees serve different purposes." <u>State v. Sanchez</u>, 129 N.J. 261, 264 (1992). "As when proving a waiver of constitutional rights generally, to prove a waiver of the right to counsel, the State must meet the heavy burden of showing that the defendant understood his or her right to

counsel and knowingly, voluntarily, and intelligently relinquished it." Ibid. (citing Brewer v. Williams, 430 U.S. 387, 404 (1977)).

"To counteract the pressures inherent in custodial interrogation, the Court mandated a set of warnings that law enforcement officers must give a suspect before beginning an interrogation . . . ." Tiwana, 256 N.J. at 41. These include advising of the right to remain silent and the right to counsel, and the failure to inform a defendant of his Miranda rights prior to a custodial interrogation "creates a presumption of compulsion," and any spontaneous statements must be suppressed, even when they "are otherwise voluntary within the meaning of the Fifth Amendment." Oregon v. Elstad, 470 U.S. 298, 307 (1985); see also State v. O'Neill, 193 N.J. 148, 170 (2007).

"Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Hubbard, 222 N.J. at 267 (quoting Innis, 446 U.S. at 300-01). An "interrogation under Miranda . . . includes: 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" A.A., 455 N.J. at 353 (quoting Innis, 466 U.S. at 301). "In resolving whether police conduct constitutes interrogation or its functional equivalent, we consider

21

whether, under the circumstances, a police officer's questioning or the functional equivalent was 'particularly evocative' or 'reasonably likely to elicit an incriminating response.'" Tiwana, 256 N.J. at 42 (quoting Innis, 446 U.S. at 303) (internal quotation marks omitted).

"A defendant's statement to the police, made in custody, is admissible if it is given freely and voluntarily, after the defendant received Miranda warnings, and after he knowingly, voluntarily, and intelligently waived his rights." State v. O.D.A.-C., 250 N.J. 408, 413 (2022). Critically, "[t]he State must prove beyond a reasonable doubt that a defendant's waiver was valid," before any custodial statements made by defendant may be used against him. Ibid.

Importantly, when an individual invokes the right to counsel or elects to remain silent, this choice must be "scrupulously honored" by the investigators. State v. Hartley, 103 N.J. 252, 266 (1986). Even an ambiguous invocation of these rights requires that questioning cease. See State v. Wright, 97 N.J. 113, 119-20 (1984); see also State v. Rivas, 251 N.J. 132, 138 (2022) ("Once [the defendant] invoked his right to counsel[,] . . . however ambiguously, the detectives were required to clarify the ambiguity or cease questioning."). However, investigators have no obligation to re-Mirandize the defendant if that defendant subsequently makes statements that are "spontaneous." State v.

Fuller, 118 N.J. 75, 85 (1990) ("[I]n defendant-initiated conversation following the exercise of the right to silence, the police need not readminister the Miranda warnings as an indispensable element of their duty scrupulously to honor that right."). "If an accused does initiate a conversation after invoking his rights, that conversation may be admissible if the initiation constitutes a knowing, intelligent, and voluntary waiver of the accused's rights." State v. Chew, 150 N.J. 30, 61 (1997).

Against this backdrop and having reviewed the motion record, we are satisfied the trial court did not misapply its discretion in suppressing statements made after defendant invoked his Miranda rights and resulting from discussions with Lieutenant Petroski and his statements to his parents that followed. Specifically, the record supports the trial court's determination that defendant was subjected to the functional equivalent of interrogation.

Initially, we reject the suggestion that the court incorrectly applied the law governing juvenile custodial interrogations to the present case. A review of the trial court's decisions, both on the motion and on reconsideration, reflect that it relied upon and applied the long-standing and controlling principles of law set forth and followed since first espoused in Innis. The trial court found the State fell short of meeting its burden to demonstrate beyond a reasonable doubt that

defendant's statements were not induced by the totality of "words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." Innis, 446 U.S. at 303. That the trial court cited A.A. does not render its decision faulty, as the court expressly recognized that A.A. was decided in the context of unique safeguards afforded to juveniles.

Further, the Court's decision in A.A. rested and built upon fundamental constitutional principles and cited directly to Innis. See A.A., 240 N.J. at 358-59. The Court, describing the police officer standing within earshot of a detained juvenile and his mother found:

> Under the circumstances, it was hardly a surprise that A.A. and his mother spoke about the crime for which A.A. had been arrested. The police should have known it was reasonably likely that A.A.'s mother would elicit incriminating responses from him. See Innis, 446 U.S. at 301. Although we find no evidence of bad faith on the part of the police, their words and actions set in motion A.A.'s incriminating statements to his mother. Under Innis, therefore, A.A. was subjected to the "functional equivalent" of express questioning while in custody. Id. at 300-01. His statements, obtained without the benefit of any Miranda warnings, are thus inadmissible.
>
> [Id. at 357-58.]

Accordingly, the trial court's references to A.A. were not erroneous, as it did not apply any further special considerations applicable to juveniles to the instant

analysis. Instead, it mirrored A.A.'s application of Innis, but did so in the context of the totality of the circumstances presented here.

The record therefore supported the court's decision. Here, at the time Lieutenant Petroski engaged with defendant, defendant had already declined to waive his Miranda rights and, thereafter, requested an attorney and to speak to his mother. The lieutenant knew defendant had already made incriminating statements while in custody and exhibited a propensity to speak about the offense even during booking. The lieutenant testified that "[n]ormally" when allowing defendants in custody to make phone calls, he would "[t]urn off the audio equipment and walk out so that they can have a phone call." Nevertheless, the recording reflects that the lieutenant, knowing defendant had invoked his rights, allowed defendant to make calls from his cell phone that was evidential, and remained in the video-recorded room, while defendant called his mother. Lieutenant Petroski also directed that the phone be left on speaker.

Significantly, before defendant called his mother, the lieutenant, without re-Mirandizing defendant, engaged in a conversation, answering defendant's questions about the charges, informing defendant he was charged with homicide, and discussing the actual offense, including defendant's possession of the firearm. When defendant asked "[h]ow[ is] it unlawful possession of a

weapon?" Lieutenant Petroski, without cautioning or clarifying whether defendant now wished to speak, responded, "Because . . . you don't have a permit to carry and you used it unlawfully against somebody." Defendant then responded, "I don't even remember having it on me," to which the lieutenant said, "[W]ell you did." When defendant said, "That sucks," the lieutenant responded, "And it sucks for the guy who's dead too." The conversation continued from there and the lieutenant never stopped to readvise of <u>Miranda</u> warnings, even after defendant again said he was going to "need a lawyer." Lieutenant Petroski did not question whether defendant now wished to discuss the homicide.

Instead, Lieutenant Petroski proceeded to initiate and listen to the conversations between defendant and his parents. We perceive no error in the court's finding defendant's rights were not scrupulously honored, and determining that this encounter in its totality amounted to the functional equivalent of interrogation because the lieutenant knew or should have known this exercise was likely to elicit further incriminating responses.

Importantly, courts need not find any nefarious intent on the part of police to meet this standard. Indeed, in <u>Innis</u>, the Supreme Court clarified,

> [t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the

intent of the police. This focus reflects the fact that the <u>Miranda</u> safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.

[446 U.S. at 301.]

The State cites to <u>Arizona v. Mauro</u>, 481 U.S. 520, 531 (1987), arguing that here, as in <u>Mauro</u>, Lieutenant Petroski's conduct did not rise to the level of an intentional "psychological ploy" or involve direct interrogation by police. But as the New Jersey Supreme Court clarified in <u>A.A.</u>, it has adopted

> the <u>Innis</u> standard and embraced the view that interrogation includes not only direct questioning but also "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." . . . <u>Hubbard</u>, 222 N.J. at 267 (quoting <u>Innis</u>, 446 U.S. at 301); <u>State v. Bey</u>, 112 N.J. 45, 68 n.13 (1988). We continue to apply the <u>Innis</u> test in accordance with its plain meaning.
>
> [240 N.J. at 354.]

We are satisfied that defendant's statements, precipitated by defendant's multiple requests for counsel and subsequent conversation about the offense with Lieutenant Petroski, were not "the unforeseeable results" of police conduct. <u>Innis</u>, 466 U.S. at 302. The court did not err in finding these police-created circumstances fashioned a favorable environment for defendant to make further

27

incriminating statements. The court soundly exercised its discretion, conducted a fact-sensitive analysis under the applicable law, both in deciding the motion and again on reconsideration. We see no reason to disturb its suppression order.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0344-24